I believe we are now ready to begin with Cortesluna v. Leon. Good morning, Your Honors. Audrey Smith for Ramon Cortesluna, Plaintiff and Appellant. I'm anticipating reserving about three minutes for rebuttal and we'll watch the clock. Okay, the clock is not quite there yet. There we go. You may start whenever you're ready. May it please the Court, we're on appeal from summary judgment in a case where there are just a multitude of disputes of material fact and disputed inferences underlying each of the elements of the cause of action for excessive force and the affirmative defense of qualified immunity. It's the plaintiff's position here that summary judgment should not have been granted with evidence viewed and reasonable inferences drawn in favor of the non-moving party, my client, Mr. Cortesluna. In addition, there is clearly established law that would place a reasonable officer on notice that the uses of force in this case were excessive and unconstitutional, but I'd like to start with the excessive force cause of action because that's a good way to get into the facts of the case. The Ninth Circuit has repeatedly held that excessive force is inherently fact-specific and only rarely taken from the jury, and this is especially true in a case like this one where there's both video and audio, which adds so many more facts. Let me point you right to the part of your argument that I have difficulty with so we're all on the same page. Sure. With Officer Leone, your client had a knife. Officer Leone could not know whether it was accessible to him when he lowered his hands because he was on the other side of your client. This is a domestic violence situation, at least as far as the officers knew, that your client had been drinking, he had a knife, he lowered his hands. That seems to me a classic situation in which Officer Leone's response was not unreasonable. I'd just like you to push back and tell me why that analysis is wrong. Yes, thank you, Your Honor. That was what the district court focused on below as well. We would like to urge the court to focus on all of the facts that were accessible to the officers in this case, starting with the fact that when they responded, there's no question that their first notice of this incident was a report from their dispatch that there was a crying teenager complaining about mom's boyfriend and saying some pretty fantastical things about what he was doing in the house. But we submit that just even there, a reasonable jury could be skeptical about the credibility of the story and not necessarily believe right off the bat that it formed the basis for a serious offense just due to the fantastical nature of it, that crying teenagers are not automatically or necessarily... Let's cut to the chase where there's a knife and instead of keeping his hands in the air, your client at one point lowered his hands and he didn't, in fact, reach for the knife, but that isn't the question. The question is whether Officer Leone had a reasonable reaction to the fact that his hands were moving towards the knife at the time of the beanbag rounds. And of course, we will again note that Officer Leone could see his... Even if Officer Leone did not see the knife, he could see Mr. Cordes Luna's hands. He could see that they were empty. He could see that they were being lowered bilaterally to the front of his thighs and that he never grasped and they were not in a grasping world as if to reach for... But he knew that he had a knife. ...before he put his hands down. Isn't that right? About a second before, Sergeant Kenzick had said, Knife, there's a knife in the left pocket. And so there were three seconds there. Just to get the timeline correct, we... Officer Revis, who had been giving the orders to Mr. Cordes Luna, had said, Get on your knees. That was the last order from Officer Revis. And then Sergeant Kenzick says, He's got a knife. And Mr. Cordes Luna starts looking to his left and starts to lower his hands as if to get on his knees in response to Officer Revis'. Or potentially as if to get to the knife. That's the problem. You know, we don't judge this, and a jury can't judge this if that were the case, by what we know afterwards. We have to judge it by what was known at the time of the actions that were taken and what a reasonable officer in that position would have understood to be the case. And one second or three seconds, this is very, very quick. I mean, we all know washing your hands for 20 seconds is a long time. But if you go one to three, it's not such a long time. And I just have difficulty seeing the unreasonableness, even potentially with respect to Officer Leon. Yes, well this is where it's very fortunate that we have video in this case, because you can see that he's not reaching, and that is a reasonable jury could arrive at that conclusion very easily, because we have video that he's lowering his hands very slowly. He does not appear to be reaching. The hands, when you reach for something, you reach with one hand, not both. But they're not going to one side. And also, you can see his facial expression on the video. His facial expression is one of confusion, and that's a perfectly reasonable thing to look at in order to reach a decision about what is in his mind. The police also acknowledged here that people are anxious and frightened during encounters of this nature, and delays, misunderstandings, and misunderstandings are not necessarily noncompliance. Also, the police acknowledged that it's recommended to have just one officer issued in command in order to avoid the confusion that occurred here. Again, his hands were empty. Officer Leung could see his hands, and the hands were empty and not grasping a weapon. Counsel, for the very same reason that you emphasized before, that the excessive force context requires consideration of all the circumstances, the Supreme Court, in the qualified immunity context, has emphasized that specificity in terms of the clearly established precedent is particularly important in the Fourth Amendment context where, and I'm quoting, where the court has recognized that it is sometimes difficult for an officer to determine how the relevant legal documents or excessive force will apply to the factual situation the officer confronts. So what's your best case to show that it's clearly established that you may not shoot a beanbag shot at someone who after, whether or not it was intentional or not, who after being told not to put his hands down, puts his hands down right next to where he has a weapon? Right, and I think while it is important not to interpret clearly established law too broadly, and the Supreme Court has cautioned and ordered against that, it's also important not to interpret it too narrowly. Clearly established facts can apply in a variety of factual contexts. The material facts that need to be similar are those which outline the concourse of the legal rule. So, for example, the Dior case was... What the court has said is that officers are entitled to qualified immunity unless the existing precedent squarely governs the specific facts at issue. What is the precedent that squarely governs the specific facts of this case? The Dior standard that every police officer should know that it is objectively unreasonable to shoot with less lethal force. An unarmed man who has committed no serious offense has been given no warning and poses no risk of flight and presents no objectively reasonable threat. In this case, it's disputed whether Mr. Cordes Luna was armed at all, which is obviously our position that he was an unarmed man because he had no subjective knowledge and a reasonable officer would not have assumed he had subjective knowledge that he was armed. In addition, he had committed no serious offense. Clearly that is disputed, but based on the totality of the circumstances, a reasonable jury could conclude that no serious offense had occurred here. He posed no immediate threat. Again, that is disputed. These are disputed facts that should be submitted to a jury and not be subject to summary judgment. If qualified immunity is over-applied, this leads to a breakdown of trust between the police and the people that they serve and protect. When a person can be summoned out onto their patio, threatened, shouted at, and confused, and then shot for misunderstanding the confusing orders, which could easily have been clarified three seconds is quick, but it's quick enough to issue a clear order, hands up, give a warning, or we'll shoot. This is a wedge between the police and the people. As I said, qualified immunity allows the police breathing room to violate constitutional rights when there's no clearly established law to provide guidance. But it's necessary to remember that this is balanced against people's constitutional rights Tell me this. I have a question. Was your client, in your opinion, engaged in active resistance or passive resistance to the police instruction to put his hands up? I think neither. He was not resisting. He simply did not understand. On the one hand, he'd been ordered to get down on his knees, and on the other, he was told, don't put your hands down, which in itself was confusing. The one clear order came as he was being shot. It was simultaneous. Sergeant Kensick said, hands up, and then Officer Leon shot my client. I understand that it's an argument against split-second decision making, but this simply wasn't a split-second decision. It's three seconds, which in geological time, or even just regular time, is a short period of time, but it is time enough to give a person some warning. You only have a few minutes left. What about Officer Revis? You haven't said anything about him. What makes his action excessive force? Officer Revis was the one that jumped on him, on Mr. Portis Luna, after he was told to get on the ground. By the way, he put his hands down in order to lower himself to the ground. Officer Revis... Is it true that he jumped on him? I don't think that's what your client testified in his deposition. I think he said he used a lot of pressure, but I don't think he said he jumped on him. Am I wrong on that? My client was face down at the time and was unable to say who was jumping on him, but we can see very clearly from the video that it was Officer Revis and then Officer Leon kneeling and applying pressure to his legs as he lay with his hands empty and visibly empty on the video. And so that's our issue with Officer Revis. But there's a difference from the point of view of excessive force from jumping on someone, which involves some striking and pressing on them to pin them down while you're handcuffing them with too much force. Those are two different types of claims, and I understood your client, based on his testimony, would be making the second argument and not the first. But if I'm wrong on that, tell me. We're saying that Officer Revis jumped on him, and this is based on what is clearly apparent on the video. And you can see Officer Revis with his leg extended jumping and placing his body weight on, not just stepping on him in order to, but actually jumping from a position onto, not with both feet, but with one foot. You're down to about a minute, if you'd like to save that for your rebuttal. That's the plan. Thank you, Your Honor. Thank you. Good morning, Your Honors. This is Lori Sobranski on behalf of the defendants and attorneys. Well, I agree with one thing. We are very fortunate to have multiple videos and audio recordings so we can see exactly what happened in this instance. Counsel, I'd like to ask you about Revis, because my concern about your position relates to him. Yes. The district court said, incorrectly, that Mr. Cortes Luna did not allege that he was injured as a result of the handcuffing and the way it was done. And I think that is not correct. The declaration said that he had ongoing neck pain, back pain, headaches, emotional distress. Whether that's serious injury is another question, but he did suffer injury. Why isn't that set of facts enough to forestall summary judgment with respect to Revis? Well, remember at the scene, the plaintiff said he was fine, he refused any kind of medical treatment, and he did not appear to be injured at all. But Counsel, in summary judgment context, we have to give the benefit of the doubt to his declaration as to his pain later on and so on. I understand. But the pain or injury that somebody is alleging that they suffer is not what we look at to determine whether the force itself was excessive. He can say that he is experiencing this now, there are no medical records to support it, but even if we assume it's true, the fact that he's claiming that these injuries does not mean the force that was applied under this particular circumstance was excessive force. How do you square that argument with our decision in Lalonde in 2000 where we said if the extent of the injury to the plaintiff's back is serious enough, a jury could conclude that the officer used excessive force? Yes. I think there are circumstances where that would be true. But in this case, first of all, the tightness of the handcuffing and injuries due to handcuffing was never pled in this case. It was not an issue in the case. But when you look at the video... We're talking about back pain here, not excessive handcuffing. Okay, if you look at the video and you look to see exactly what this officer did, there was nothing that he did that would show that he was putting any kind of excessive force onto this gentleman when he was on the ground. That sounds to me like a really good jury argument as to whether it was excessive, but it just seems really quite indistinguishable from Lalonde, except that in Lalonde there was more reason to be pushy because the person was resisting, whereas this person was not resisting, so presumably less force would be appropriate. Well, in this case, Officer Rivas testified that when the plaintiff was moving to the ground, to get down to the ground, he was going very slowly, and Officer Rivas was concerned that he might be thinking about trying to get away or trying to get back in the house. And remember, he still has the knife. He still has the knife. So the officers are extremely concerned about the danger that this presents. But wait, at that point he had already been shot twice by the beanbag shotgun, hadn't he? Once in the abdomen and once in the left hip. And he was in pain. He hadn't shot. He says he was in pain. I would not disagree with that. I'm sure he was in pain. But he was still standing. He still had the ability to reach for and grab that knife, and that's what the officers were so concerned about. So when he starts to go down, still with the knife in his pocket, Officer Rivas testified he was very concerned that he could still get at that knife or he might try to slip away. And so he did what is standard police procedure. He used his foot to control the plaintiff, get him on the ground, then used his knee and then straddled him so that he could be handcuffed. All of that is standard police procedure. All of it. Is it standard police procedure to then lift him up by his handcuffed arms, which is also alleged? He alleges that, and that actually is standard procedure. And the testimony on that is the officers do it frequently, because the handcuffs are a place that you can grab. And there was some exigency here. They had to move this gentleman out from this doorway as quickly as possible, because this is the fatal funnel in police terms. They had to get him for his own safety and the safety of the officers out of that doorway. Counsel, I have a follow-up question to the colloquy you just had with Judge Gilman. Yes. If something is standard police procedure, does that insulate it from a claim of excessive force? No. If, in a particular circumstance, the procedure is followed roughly or with more force than usual or than necessary in the circumstances, it may be standard, but that doesn't mean, does it, that it's sort of king's X, there can be no claim? No, I agree with that. And in some of the cases where the facts situations have dealt with an officer picking up somebody by the handcuffs and moving them, sometimes it is clearly excessive. When they pick them up from the ground, use those to throw somebody to get them in the back of the patrol car, for example. But in this particular case, and the video just makes this crystal clear, he uses the handcuffs as something to pull Mr. Cordes-Luma out of the doorway. He moves him a few feet by doing that. I'm sure that's uncomfortable. I would agree with Mr. Cordes-Luma if he testifies it was uncomfortable when that happened. But that does not make it excessive. They were doing what they had to do to get him out of that doorway as quickly as they could, and they moved him a few feet out of the way, and that was it. So, it's not black and white that if you ever grab the handcuffs to move somebody that it's automatically excessive. There's not a case I know of that says that is true. Can I ask you a question? I want to go back to Officer Leon's action with shooting him twice with the beanbag shotgun. Now, as I see from the facts, you had five officers there, right? Correct. And five officers were all pointing guns at him, right? Correct. And he was about 10 to 11 feet from the officers. Correct. And he was standing there, and the video clearly shows he lowered his hands, but he had his head down in sort of what looked like a submissive position. And without any warning, he shot twice by Officer Leon. Now, on those facts, I guess I'm puzzled with how Officer Leon could have objectively thought that he could perceive himself in imminent danger from Cortez-Luna when you've got five people pointing guns at him. And if he's armed, yeah, he's got a knife in his pocket, but he would hardly be able, even if he wanted to grab the knife, would have been able to attack five policemen holding guns on him. So how does that not raise a jury question of whether Leon objectively thought that he was in imminent danger when he started shooting Cortez-Luna? Well, because you have to look at the total circumstances, all of the facts. Yes, there were officers there with guns. But remember, the officers, you have to put this in context, the officers are responding to a very volatile and dangerous situation to their knowledge. This is a domestic violence situation with a gentleman with a chainsaw. The girlfriend and children are barricaded in the house because they are afraid for their lives. Well, wait. When they got there, they observed him for five minutes sitting calmly in the kitchen drinking a beer before they knocked on the door to call him out. So it wasn't as if they were charging in in the midst of a chainsaw saw down the door to get to the girlfriend. No, but they don't have to see this event happening to understand that this is a very dangerous situation. They can't second-guess that. Remember, the 911 dispatch person heard a chainsaw in the background and that was reported to the police. So these officers have to be extremely cautious, not only for their own security, but for the woman and the children that are in this house. I'm saying this because this is the context within which they are responding. But Mr. Cordis Luna, they asked him to come out, he comes to the door, he has a tool in his hand, they consider that a possible weapon, they ask him to drop it, he does, they order him to come out of the house with his hands up, walk towards me, he does that, they continue to tell him to keep coming, he's doing it, he's calm, he is following orders and seeming to understand what is going on. Where things go wrong, where things get out of control, as Lieutenant Gratz said, the situation was controlled and then it's not, is as soon as Sergeant Kensick sees that knife. When he sees that knife, in this context, he yells, he has a knife, he has a knife in his left pocket, and he immediately orders, don't put your hands down, hands up, Plaintiff admits to hearing that, but he defies the order and he lowers the hands toward the knife. So, this is a defiant act, he's followed all the orders, as soon as they are acknowledging that he has a knife, he defies it, and he lowers his hands toward it, and you can see on that videotape, that knife is right on the side pocket of his pants at his thigh. He lowers that hand and it comes right close to the knife. He doesn't grab it, he doesn't wave it around. But again, answer my question, why does that allow Leon to think he's in imminent danger when five officers are pointing guns at him? Well, because the testimony is that being at that distance away, if Mr. Cordes Luna had grabbed that knife, he was easily within close enough range that he could have hurt one of those officers. Oh, you think at 10 feet, 11 feet away, five men with guns couldn't have blown him away? With all he had is a knife? Well, remember, they are trying not to blow this guy away. I mean, that's the irony of this whole situation, is these officers were trying to do everything they could to minimize this. That's why they made sure they had less lethal and made sure that officers knew less lethal would be used if needed, because they didn't want the officers to fire bullets that could kill this man. They were trying to contain this. Right, but I think the law is that you can't even use less lethal unless there was objective belief that they were in imminent danger, and I just don't see how any of these people, including Leon, could think he was in imminent danger with he and four buddies all holding guns pointing at him. Well, because he could have taken that knife and thrown it at somebody and stabbed one of the officers with it. He could have lunged and got one of the officers. It was not that big of a distance. You can see from the video. These officers had their backs up against a wall. This was a side patio, and so there was nowhere for these officers to reposition that they could control this and prevent Mr. Cordes Luna from getting back in the house, and that was their biggest concern. They were trying to contain the danger to the folks in the house, so they could not move in a position where they could stop Mr. Cordes Luna from getting back in the house unless they were, I guess, to shoot him dead, which they certainly did not want to do, but in this context, in this situation, with this man having a knife accessible to him in this physical setup, it was clearly a situation where a reasonable officer, a reasonable officer, considered under all of those facts that there was an imminent threat. But you're having to say that they would determine that a jury would have no choice, but all reasonable jurors would so decide, where maybe this is a case where the jury should decide this. There may be a dispute here. That's sort of the real issue, should summary judgment have been granted. Well, I mean, that's always the issue on summary judgment, right? But we know from Scott v. Harris that when there is video evidence that tells you exactly what is going on, we can see all of the circumstances clearly without characterization. Counsel, my question to you is similar to my earlier one. Just because there's video evidence, that doesn't seem to mean that there can't be different interpretations of the inferences to be drawn from what is seen. In other words, everyone literally sees the same thing, but may not draw the same conclusions from seeing the same thing. So is it your argument that just because there's video, there has to be summary judgment, or is it a narrower claim? Oh, it's narrow. It doesn't mean that. It just means that some of the factual characterizations that plaintiff has raised, for example, to try to convince the court that there's an imminent threat or it wasn't serious, are based upon characterizations of fact that just are blatantly contradicted by what we know happened. For example, there was no jumping, there was no stomping, there was no gang tackling. None of that. I understand your position, and I believe your time has expired. Thank you very much. Thank you. And there's some rebuttal time remaining for you. Yes, Smith. Thank you, Your Honors. This is not a Scott v. Harris case. There the video record was directly at odds with the plaintiff's contention, and there was no reasonable inference that could be raised from the video record that he was doing anything other than... I think the timer is off here. Oh. There you go. Hello. I think you have about a minute left, so we'll start... Right. Bonnie, if we can get that to read for a minute. One minute, please.  Thank you. Thank you. Okay, so not a Scott v. Harris case. I do want to emphasize that, and correct counsel's earlier representation, the hands-up order, the one clear order, and the first shot were almost simultaneous. There was no time for him to hear the order and react to it, because it came at the same time as him being shot. With regard to the argument about how the officers could not reposition, we dispute that. Maybe they couldn't reposition east-west because there was a wall behind them, but they could have gone north-south along the wall if they felt that there was real danger or an immediate threat posed by Mr. Cordes Luna. They could have put distance between themselves and him. I'd also like to point out that while the house was being surveilled, the dispatch reported that the reporting party said that Mr. Cordes Luna was actually sawing at the time the officers said they heard nothing. This is on the video and their audio body cams. Lastly, I'd like to point out that there are three cases cited, Smith, Dior, and Glenn, that actually arose from 911 calls by family members who felt scared and felt threatened. In each of these cases, the court found that there was no serious offense committed by the plaintiff. Thank you. Thank you, counsel. The case just argued is submitted, and we appreciate the helpful arguments from both of you.
judges: Gilman, Graber, Collins